MISSOURI PACIFIC RAILROAD
COMPANY d/b/a Union Pacific
Railroad Company, Petitioner,

v.

Patricia LIMMER, Billye Joyce Smith,
and Bobby Jean Nothnagel,
Respondents.

No. 06–0023.

Supreme Court of Texas.

Argued Nov. 13, 2007.

Oct. 23, 2009.

Rehearing Denied Jan. 15, 2010.

Kathleen Hopkins Alsina, David Lee Crawford, Phelps Dunbar, L.L.P., Harding J. Rome, Union Pacific Law Department, Houston, TX, Mike A. Hatchell, Molly H. Hatchell, Locke Lord Bissell & Liddell LLP, Austin, TX, for Petitioner.

Deborah G. Hankinson, Hankinson Levinger LLP, Dallas, TX, David M. Gunn, Russell S. Post, Beck, Redden & Secrest, L.L.P., Carl V. Crow, Law Office of Carl V. Crow, Houston, TX, Elana S. Einhorn, The University of Texas School of Law, Austin, TX, for Respondents.

Wayne Lindsey Robbins Jr., Fort Worth, TX, for Amicus Curiae BNSF Railroad Company.

James L. Walker, Jackson Walker, L.L.P., San Antonio, TX, for Amicus Curiae Association of American Railroads.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, and Justice WILLETT joined.

In this wrongful death action arising out of a truck-train collision, the plaintiffs

claim that crossbucks—the familiar black-and-white, X-shaped signs that read "RAILROAD CROSSING" [1]—provided inadequate warning for the railroad crossing and that the railroad was negligent in failing to remove a gravel pile and vegetation that restricted drivers' view of approaching trains. The railroad contends that federal law preempts these claims. When railroad crossing improvements are federally funded, federal regulations specify what warning devices must be used,[2] and the United States Supreme Court has held that section 20106 of the Federal Railroad Safety Act of 1970 [3] expressly preempts state tort law actions challenging the adequacy of those devices.[4] The trial court concluded that federal regulations do not apply in this case, and the court of appeals affirmed.[5] We disagree and accordingly reverse the judgment of the court of appeals and render judgment that the plaintiffs take nothing.

## I

### A

In late 1990, Billy Howard Limmer and his wife Patricia bought a home in Thorndale, a small central Texas farming community (1 sq. mi., 1990 pop. 1,092), where they intended to live after Limmer retired in March 1994. They attended Thorndale High School, married, and moved away to work, but often returned to visit family in the area.

The Union Pacific Railroad runs through the middle of Thorndale east and west, parallel to and just south of state highway 79. On average, some two dozen trains pass through Thorndale every day. The tracks cross several streets, including Front Street, which runs south from the highway, then turns east and continues along the south side of the tracks. The following schematic illustrates the site:

1. U.S. Dep't of Transportation, Federal Highway Administration, Manual On Uniform Traffic Control Devices, at Table 2A–4 (2003) (Use of Sign Shapes), *available at* http://mutcd.fhwa.dot.gov/pdfs/2003r1r2/mutcd2003r1r2complet.pdf [hereinafter Manual].

2. 23 C.F.R. § 646.214(b)(3)-(4).

3. Pub. L. No. 91–458, § 205, 84 Stat. 971, 972 (1970), recodified as amended at 49 U.S.C. § 20106 (2006). A 2007 amendment, "clarifying railroad preemption", retroactive only to 2002, does not apply here. Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. 110–53 § 1528 ("Railroad Preemption Clarification"), 121 Stat. 265, 453 (applicable to "all pending State law causes of action arising from events or activities occurring on or after January 18, 2002"); *see Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1214–216 (10th Cir.2008).

4. *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 358, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000)

(the Federal Railroad Safety Act of 1970, 84 Stat. 971, as amended, 49 U.S.C. § 20101 et seq., in conjunction with the Federal Highway Administration's regulations addressing adequacy of warning devices installed with federal funds, 23 C.F.R. §§ 646.214(b)(3) and (4) (1999), preempts state tort actions concerning a railroad's failure to maintain adequate crossing warning devices when federal funds have participated in the devices' installation); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 671, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (holding that, under the FRSA and federal regulations, only excessive speed claims were preempted; claims arguably involving *Manual* standards were not "covered" by federal regulations, and claims based on the railroad crossing were not preempted, given the failure to establish participating federal funds).

5. 180 S.W.3d 803 (Tex.App.-Houston [14th Dist.] 2005).

At the Front Street crossing,[6] near the highway, there are two sets of standard gauge tracks (*i.e.,* 4' 8-1/2" wide) about 10' apart. The tracks farthest from the highway are the main line, on which trains can travel up to 60 mph. The tracks nearer the highway are for a siding.[7] The crossing is very rough and bumpy, and vehicles must take it very slowly. A crossbuck stands 64'—three or four car-lengths—from the highway, 14' before the siding. A second crossbuck is located on the other side of the main line, facing traffic coming from the opposite direction. There are no other warning devices. Trains sound their horns to signal their approach. In April 1994, a pile of gravel as big as a house— some 14' high and 100' long—lay alongside the siding about 160' west of the crossing. The gravel pile restricted a driver's view westward, as did vegetation growing in the railroad right-of-way, but a driver could still see more than 200' down the tracks to the west.

Just after 5:00 p.m. on April 26, 1994, Limmer drove his pickup south on a town street to highway 79, turned left going east, then turned right a block or two later off the highway onto Front Street. Eyewitnesses heard the horn of an eastbound train approaching at 40–50 mph and watched as Limmer drove very slowly down Front Street, across the siding, and into its path. Limmer was killed instantly.

**B**

Patricia Limmer and her two daughters sued the Union Pacific. We refer to the parties as the Limmers and the Railroad. As an affirmative defense, the Railroad asserted that the Limmers' claims were expressly preempted[8] by the Federal Rail-

---

**6.** Texas Department of Transportation Crossing No. 446 546V.

**7.** A siding is an "auxiliary track for meeting or passing trains." 49 C.F.R. § 236.802a.

**8.** U.S. CONST. art. VI, cl. 2 ("The Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Altria Group, Inc. v. Good*, 555 U.S. ——, ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008) ("[W]e have long recognized that state laws that conflict with federal law are without effect." (internal quotation marks and citation omitted)); *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex.2001) ("A federal law may expressly preempt state law.").

road Safety Act of 1970 (FRSA).[9] Congress enacted FRSA "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and injuries to persons".[10] FRSA calls for "[l]aws, regulations, and orders related to railroad safety [to] be nationally uniform to the extent practicable."[11] To that end, FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety"[12] and provides in section 20106 that a "State may adopt or continue in force a law, regulation, or order related to railroad safety ... until the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement...."[13] In two cases, *CSX Transportation, Inc. v. Easterwood*[14] and *Norfolk Southern Railway v. Shanklin,*[15] the United States Supreme Court has held that under section 20106, federal regulations "covering the subject matter" of a railroad safety requirement of state law preempt state law, including common law tort liability.[16] The accident in *Shanklin* was very similar to the one in this case: the deceased drove his truck into the path of an oncoming train at a crossing marked only by crossbucks.[17]

The Highway Safety Act of 1973(HSA) grants federal funding to states to "eliminat[e] ... hazards of railroad-highway crossings".[18] In return, HSA requires each state to "conduct and systematically maintain a survey of all highways and identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose."[19] Under the authority of both FRSA and HSA, the Secretary of Transportation, through the Federal Highway Administration (FHWA),[20] has promulgated numerous regulations, including several addressing the installation of warning devices at railroad crossings.

The regulations at 23 C.F.R. § 646.214(b)(3) & (4) govern the design of grade crossing improvements for federally funded railroad-highway projects. We will refer to them as the "Grade Crossing Design" regulations. Subsection (b)(3) requires adequate warning devices that include automatic gates with flashing light signals if any of six enumerated conditions is present.[21] Where none is present, sub-

---

9. Pub. L. No. 91–458, 84 Stat. 971, codified as amended at 49 U.S.C. §§ 20101 *et seq.* (2006 & Supp. 2008).

10. Pub. L. No. 91–458 § 101, 84 Stat. 971.

11. *Id.* § 20106(a)(1).

12. *Id.* § 20103(a).

13. *Id.* § 20106(a)(2). Subsection (a)(2) continues with an exception regarding essentially local safety hazards that is inapplicable here.

14. 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

15. 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).

16. *Shanklin*, 529 U.S. at 357–358, 120 S.Ct. 1467; *Easterwood*, 507 U.S. at 670–671, 113 S.Ct. 1732.

17. *Shanklin*, 529 U.S. at 350, 120 S.Ct. 1467.

18. Pub. L. No. 93–87, §§ 201, 203, 87 Stat. 282, 282–283 (see note following 23 U.S.C. § 130); *Shanklin*, 529 U.S. at 348, 120 S.Ct. 1467; *Easterwood*, 507 U.S. at 662–663, 113 S.Ct. 1732.

19. Pub. L. No. 93–87, § 203, 87 Stat. 282, 282–283 (codified as amended at 23 U.S.C § 130(d)).

20. 49 C.F.R. § 1.48(b)(1).

21. Subsection (b)(3) states:
"(3)(I) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

section (b)(4) states that "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of the FHWA." According to the Supreme Court, when subsections (b)(3) and (b)(4) apply, the Secretary "has determined the devices to be installed and the means by which railroads are to participate in their selection."[22] These regulations therefore "cover the subject matter of state law which, like the tort law ..., seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings",[23] and thus preempt common law tort liability for a claim that a warning device installed at a railroad crossing was inadequate.[24]

The Limmers do not contend that any of the six conditions described in subsection (b)(3) was present at the Front Street crossing. Thus, subsection (b)(4) applies to any warning device installed there using federal funds.[25] The Railroad offered evidence of two federally funded programs to improve railroad crossings in Texas. The purpose of the first, implemented between 1977 and 1981, was to install or upgrade crossbucks at certain crossings using metal, reflectorized signs. The Railroad participated in the program, but it had more than 3,100 crossings in Texas at the time, and the Limmers contend that the evi-

"(A) Multiple main line railroad tracks.
"(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
"(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
"(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
"(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
"(F) A diagnostic team recommends them.
"(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable."

22. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 671, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *see also Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 357, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) ("When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject.").

23. *Easterwood,* 507 U.S. at 671, 113 S.Ct. 1732.

24. *Shanklin,* 529 U.S. at 357–358, 120 S.Ct. 1467 ("Sections 646.214(b)(3) and (4) 'cover the subject matter' of the adequacy of warning devices installed with the participation of federal funds. As a result, the FRSA preempts [a] state tort claim that the advance warning signs and reflectorized crossbucks installed at [a] crossing were inadequate."); *Easterwood,* 507 U.S. at 670–671, 113 S.Ct. 1732 ("In short, for projects in which federal funds participate in the installation of warning devices, the Secretary [of Transportation] has determined [in 23 C.F.R. § 646.214(b)(3)-(4)] the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.").

25. *Shanklin,* 529 U.S. at 353–354, 120 S.Ct. 1467 (subsections (b)(3) and (b)(4) "apply to 'any project where Federal-aid funds participate in the installation of the devices' " (quoting 23 C.F.R. § 646.214(b)(3)(i) (1999))); *Easterwood,* 507 U.S. at 670–672, 113 S.Ct. 1732.

dence falls short of establishing that the crossbucks at the Front Street crossing were installed as part of the program. The second program, authorized by the Legislature in 1989,[26] involved attaching retroreflective tape to the pole and back of the blades of every crossbuck in Texas. Retroreflective material reflects light back in the direction of its source. Thus, when a vehicle's lights shine on an object marked with retroreflective material, the light is reflected back toward the vehicle, causing the object to appear brighter to the driver. The Limmers do not dispute that federal funds helped pay for the tape on the crossbucks at the Front Street crossing,[27] but they contend that the improvement did not amount to the installation of a warning device within the meaning of the federal regulations.

### C

■ The jury found Limmer and the Railroad both negligent in causing the collision and apportioned responsibility 15% to Limmer and 85% to the Railroad. The jury found the Railroad negligent in two respects: in failing to provide additional warning devices—automatic signals, a flag man, or a stop sign—at an extra-hazardous crossing; and in answer to a separate question, in failing to eliminate the sight restriction caused by the gravel pile or vegetation. The jury awarded compensa-

tory damages totaling $6 million. The preemption defense was tried, without objection, to the bench, and the evidence was offered outside the presence of the jury. The trial court rejected the defense without making any findings of fact and rendered judgment on the verdict.

On appeal, the Railroad argued that it had established its preemption defense, and that a failure to eliminate sight restrictions at the crossing was not an independent basis for liability.[28] The Railroad acknowledges that it had the burden to prove preemption, that the trial court presumably resolved all factual disputes against preemption,[29] and that it must therefore demonstrate that preemption has been established as a matter of law.[30] At first, the court of appeals reversed and rendered judgment for the Railroad, holding that preemption had been established, but on rehearing, it reversed and remanded for a new trial.[31]

■ Whether the crossbucks at the Front Street crossing were installed using federal funds was a factual matter, and while there may have been some evidence that the installation was federally funded, the court concluded that the documentary evidence was inconclusive and that there were reasons why the trial court could have decided not to credit the testimony of the witnesses who testified in support of

26. Act of May 17, 1989, 71st Leg., R.S., ch. 269, 1989 Tex. Gen. Laws 1212.

27. At oral argument, counsel for the Limmers was asked: "Could I be sure that you do agree that federal funds were spent on the installing the tape?" To which counsel responded: "We do, your Honor."

28. 180 S.W.3d 803, 806–807 (Tex.App.-Houston [14th Dist.] 2005).

29. *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex.1996) ("Because the trial court

did not render findings of fact or conclusions of law, we must assume that it made all findings in support of its judgment....").

30. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (per curiam) ("When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue.").

31. 180 S.W.3d at 829.

the Railroad's position.[32] Thus, the court held, the Railroad had not established that basis for preemption as a matter of law. Whether the federally funded application of the retroreflective tape to the crossbucks constituted the installation of a warning device under federal law was a legal issue, and the court held it did not.[33]

Finally, the court held that a railroad's negligent failure to eliminate sight restrictions at a crossing is not an independent basis for liability for causing a collision but is merely a consideration in determining whether the railroad was negligent in warning of the crossing.[34] Thus, the trial court erred in submitting a separate jury question regarding sight restrictions.[35] Finding itself in doubt whether the erroneously submitted question improperly influenced the jury, the court concluded that a new trial was required.[36]

The Limmers and the Railroad petitioned for review. We granted both petitions.[37]

## II

The 1989 project, one of the two projects on which the Railroad rests its preemption defense, was developed by FHWA and authorized in Texas by statute requiring what was then the State Department of Highways and Public Transportation to "develop guidelines and specifications for the installation and maintenance of retroreflectorized material at all public grade crossings not protected by active warning devices." [38] The statute broadly defined a "warning device" as "an active warning device, crossbuck, or other traffic control sign, the purpose of which is to alert motorists of a grade crossing",[39] and more specifically defined an "active warning device" as "a bell, flashing light, gate, wigwag, or other automatically activated warning device." [40] The statute also defined "retroreflectorized material" as "material that reflects light so that the paths of the reflected light rays are parallel to those of the incident rays." [41] The statute provided that "retroreflectorized material shall be affixed to the backs of crossbucks and their support posts in a manner that retroreflects light from vehicle headlights to focus attention to the presence of a nonsignalized crossing" [42]—that is, "a crossing not protected by active warning devices".[43] One FHWA official described the agency's research with "[r]etroreflective material installed on the backs of

32. *Id.* at 811–817.

33. *Id.* at 817–821.

34. *Id.* at 821–828.

35. *Id.* at 828.

36. *Id.*

37. 50 Tex. Sup.Ct. J. 801 (June 1, 2007).

38. Act of May 17, 1989, 71st Leg., R.S., ch. 269, § 2, 1989 Tex. Gen. Laws 1212, 1213, previously codified as TEX.REV.CIV STAT. ANN. art. 6370b, § 2, recodified by Act of May 1, 1995, 74th Leg., R.S., ch. 165, 1995 Tex. Gen. Laws 1025, 1460, now TEX. TRANSP. CODE § 471.004(a) (substituting the phrase "reflecting material" for "retroreflectorized materi-

al"). The references in notes 39–43 and 61–62 are to these enactments.

39. *Id.* § 471.004(f)(7) (formerly art. 6370b, § 1(8)).

40. *Id.* § 471.004(f)(1) (formerly art. 6370b, § 1(1)).

41. *Id.* § 471.004(f)(5) (formerly art. 6370b, § 1(6)) (defining "reflecting material").

42. *Id.* § 471.004(a) (formerly art. 6370b, § 2) (substituting the phrase "unsignaled crossing" for "nonsignalized crossing" and "reflecting material" for "retroreflectorized material").

43. *Id.* § 471.004(f)(6) (formerly art. 6370b, § 1(4)) (defining "unsignaled crossing").

crossbucks and their support posts" as follows:

> These devices were located on the far side of the crossing from approaching traffic so as to retroreflect light from the vehicle headlights through the moving gaps in the train. The resulting flickering light attracts the driver's attention to the presence of a moving train at the crossing. [The] devices were visible at 200–300 feet in advance of the crossing through the gaps between train cars and wheels.[44]

Texas received more than $1.3 million in federal funds for the project,[45] some of which were used to apply retroreflectorized tape to the poles and backs of the blades of the crossbucks at the Front Street crossing. The Railroad contends that this was an installation of a warning device within the meaning of subsection (b)(4) of the Grade Crossing Design regulations, preempting the Limmers' claims that the warning signs at the crossing were inadequate.

Federal regulations distinguish between active and passive warning devices at railroad crossings, referring to both as traffic control devices.[46] Passive warning devices, the only kind involved in this case, are defined as "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." [47] Other than this brief, non-exclusive list of examples—"signs, markings, and other devices"—the federal regulations do not define traffic control devices. But FHWA's *Manual on Uniform Traffic Control Devices,* incorporated into its regulations,[48] defines them as "all signs, signals, markings, and other devices used to regulate, warn, or guide traffic, placed on, over, or adjacent to a street, highway, pedestrian facility, or bikeway by authority of a public agency having jurisdiction." [49] And "traffic markings" are defined in FHWA's *Railroad–Highway Grade Crossing Handbook* as "[a]ll lines, patterns, words, colors, or other devices, except signs, set into the surface of, applied upon, or attached to the pavement or curbing or to the objects within or adjacent to the roadway, officially placed for the purpose of regulating, warning, or guiding traffic." [50]

**44.** Letter from Mr. Greg Scherz, Safety & Traffic Operations Coordinator, FHWA, to Mr. R.E. Stotzer, Jr., State Engineer–Director, State Dep't of Highways and Public Transportation (Jan. 17, 1989).

**45.** Letter from Mr. Frank M. Mayer, Div. Administrator, FHWA, to Mr. Arnold W. Oliver, State Engineer–Director, State Dep't of Highways and Public Transportation (Jan. 15, 1991) (stating that "[t]he amount of Federal funds obligated for this project is $1,371,384").

**46.** 23 C.F.R. § 646.204 (2008).

**47.** *Id.*

**48.** 23 C.F.R. § 655.601(a) (2008); *see also* 23 C.F.R. § 646.214(b)(1) ("All traffic control devices proposed shall comply with the latest edition of the [MANUAL] ...."); 23 C.F.R. § 655.602 ("The terms used herein are defined in accordance with definitions and usages contained in the *[Manual]* and 23 U.S.C. 101(a)."); *Easterwood,* 507 U.S. at 666, 113 S.Ct. 1732.

**49.** MANUAL, *supra* note 1, at I–1.

**50.** FEDERAL HIGHWAY ADMINISTRATION, RAILROAD–HIGHWAY GRADE CROSSING HANDBOOK 254 (2d ed., September 1986), *available at* http://www.fhwa.dot.gov/tfhrc/safety/pubs/86215/86215.pdf; *see also* Railroad–Highway Grade Crossing HANDBOOK (rev. 2d ed. August 2007), *available at* http://safety.fhwa.dot.gov/xings/com—roaduser/ 07010/. Both versions of the Handbook contain similar warnings at their opening pages, cautioning that although the

■ Retroreflective tape attached to a crossbuck is certainly a marking used to warn traffic of railroad crossings. The point of the 1989 program was that the addition of retroreflective tape to crossbucks would provide traffic with an additional, different warning of railroad crossings, making them more visible to motorists. The retroreflective tape on the crossbucks in this case was "placed ... adjacent to a street ... by authority of a public agency having jurisdiction". It was thus a warning device within the meaning of subsection (b)(4) of the federal regulations.

The Limmers argue that retroreflective tape cannot be a traffic control device because it merely reflects light and does not, as their expert, K.W. Heathington, put it, "tell[ ] motorists to stop, to look, to observe, to turn right or to not turn right, or anything of that nature". They point out that retroreflective tape is nowhere mentioned as a traffic control device in the FHWA's *Manual*. But the *Manual* contemplates that most signs and warning devices will be retroreflective; it also mentions strips for crossbucks in several sections.[51] Markings are specifically mentioned in the federal regulations as traffic control devices. More importantly, the use of retroreflective strips on crossbuck posts and blade-backs is designed to reflect light back at motorists, to attract

attention and provide an enhanced warning, which was the purpose of the 1989 program.

The Supreme Court's decision in *Easterwood* illustrates well the difference between a device that warns and one that does not. There, gates were to be installed at five adjacent crossings as part of a single project.[52] Motion-detection circuitry was installed at all five crossings and gates were installed at four of them, but the plan for gates at the fifth crossing was abandoned, and that is where the accident occurred.[53] The Supreme Court easily rejected the argument that the circuitry alone was a warning device, even though it was installed as part of a project to provide warnings at other crossings.[54] Unlike the circuitry in *Easterwood*, the retroreflective tape at the Front Street crossing actually provided motorists warning of the crossing.

■ The Limmers rely on a letter that their expert, Heathington, obtained from Shelley Rowe, director of FHWA's Office of Transportation Operations, shortly before trial. Heathington had written a brief letter to Rowe on June 27, 2000, enclosing two photographs of the Front Street crossing and stating, "[i]n my opinion, the tape which is used in this fashion is not a traffic control device as defined by the *[Manual].*"[55] Heathington concluded: "I am

Handbook is disseminated under the sponsorship of the Department of Transportation, the Government assumes no liability for use of its contents, its contents do not necessarily constitute official policy, and this "report does not constitute a standard, specification, or regulation."

51. MANUAL, *supra* note 1, in ch. 8B.01, "Signs and Markings," § 8B.03, fig. 8B–1, at 8B–1, 8B–4; *see also* § 2a.21, at 2A–14, 2A–15 (standards for retroreflective strips on sign supports); ch. 5F ("Traffic Control for Highway–Rail Grade Crossings"), § 5F.02, at 5F–1; ch. 10C, § 10C.01, fig. 10C–1, at 10C–1,

10C–2 (both also concerning use of retroreflective strips on the back of the supports and blades of crossbucks).

52. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 671–672, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

53. *Id.*

54. *Id.*

55. Letter from K.W. Heathington to Shelley J. Rowe, Director, Office of Transportation Operations, FHWA (Aug. 2, 2000).

hoping that you being from FHWA can confirm this conclusion about the use of the tape." [56] Rowe's brief letter in reply, dated August 2, 2000, stated merely, "[r]etroreflective tape is not considered a traffic control device and, therefore, its use around a traffic sign post does not conflict with the standards in the *[Manual]*." [57]

The Limmers do not argue that Rowe's letter is entitled to deference, only that it provides support for Heathington's opinions. In deciding what effect to give Rowe's letter, we are guided by the United States Supreme Court's observations in *Skidmore v. Swift & Co.*[58] in a similar context. Regarding the views of the Administrator of the Wage and Hour Division of the U.S. Department of Labor, the Court wrote:

> We consider that the rulings, interpretations and opinions of the Administrator under [the Fair Labor Standards Act], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pro-

nouncements, and all those factors which give it power to persuade, if lacking power to control.[59]

We have nothing to indicate that Rowe's consideration of Heathington's request was thorough. The letter contains no reasoning and no reference to authority of any kind. The conclusory opinion is accompanied by an opaque and unexplained reference to there being no conflict with the *Manual*. The letter is also in some tension with another FHWA official's letter in 1989, encouraging participation in the retroreflective tape program, repeatedly referring to the tape as a "device" and describing its use as a warning signal. In sum, we are unable to ascribe any persuasive value to Rowe's letter.[60]

The Limmers argue that the 1989 Texas statute suggests that "retroreflectorized material" is not a warning device by defining the two terms separately.[61] The statute gives no indication that it was interpreting the meaning of the terms under federal law. But even if it did, we think the statute suggests just the opposite by providing that "[t]he cost of initial installation of retroreflectorized material shall be paid from money appropriated . . . for the purpose of maintaining grade crossing warning devices." [62]

---

56. *Id.*

57. Letter from Shelley J. Rowe, Director, Office of Transportation Operations, FHWA, to K.W. Heathington (Aug. 2, 2000).

58. 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

59. *Id.* at 140, 65 S.Ct. 161.

60. The parties also cite three orders of federal district courts, all in Texas, which consider the preemptive effect of the 1989 program. One granted summary judgment dismissing the case, *McDaniel v. S. Pac. Transp.*, 932 F.Supp. 163 (N.D.Tex.1995); the other two

denied summary judgment in unpublished orders, *Lesly v. Union Pac. R.R. Co.*, No. H–03–0772, 2004 U.S. Dist. LEXIS 23018 (S.D. Tex. June 25, 2004); *Enriquez v. Union Pac. R.R. Co.*, No. 5:03–CV174, 2004 U.S. Dist. LEXIS 28989 (E.D.Tex. Dec. 30, 2004) (holding that, in the same sense that the pole of a crossbuck sign is not a passive warning device, the tape, without more, is not a passive warning device under 23 C.F.R. § 646.204, and that, under *Shanklin*, it was irrelevant whether the tape met *Manual* standards). None provides persuasive authority for our decision today.

61. TEX. TRANSP. CODE § 471.004(f)(5) & (7) (formerly art. 6370b, § 1(6) & (8)) (defining "reflecting material").

■ Finally, the Limmers argue that the application of retroreflective tape to the crossbucks at the Front Street crossing was only an enhancement or maintenance of the existing signs, not an installation. We see no reason why enhancement or maintenance of an existing sign to meet FHWA requirements is anything less than approval of "the type of warning device to be installed" within the meaning of subsection (b) of the Grade Crossing Design regulations. Even if enhancement or maintenance were not "approval", the retroreflective tape was itself a warning device, and its addition to the existing crossbucks an installation.

Accordingly, we conclude as a matter of law that the application of retroreflective tape to the crossbucks at the Front Street crossing was an installation of a federally funded and approved warning device. The Limmers acknowledge that if the 1989 program was covered by subsection (b)(4) of the Grade Crossing Design regulations, their inadequate warning claims were preempted by section 20106 of FRSA. We therefore need not consider the Railroad's other basis for preemption, that federal funding of the 1976 program was conclusively established.

### III

The Limmers contend that the Railroad had a duty to keep the crossing free of obstructions restricting sight of approaching trains, and that breach of that duty was negligence for which the Railroad is liable, irrespective of the adequacy of the warning at the crossing. More than a century ago, we held that there is no such duty; rather, the presence of sight-restricting obstructions is but a consideration in determining whether the operation of the train was negligent.

In 1897, in *Missouri, Kansas & Texas Railway Co. of Texas v. Rogers*, the plaintiff had just begun to drive his wagon over a railroad street crossing when suddenly he saw that boxcars were being pushed toward him, and he leapt from the wagon to get out of the way, thereby injuring himself.[63] He alleged that, in attempting to cross the tracks, his view had been obstructed by a coal house, an ice house, and a beer house, which the railroad should not have allowed to be built on its right-of-way, and by a boxcar, which should not have been left standing on a siding.[64] The jury, having been instructed that the railroad had a "duty ... to use ordinary care ... to avoid such obstructions on its right of way and side tracks ... as would prevent persons crossing ... to discover the approach of trains", found for the plaintiff, and the trial court rendered judgment on the verdict.[65] We reversed and remanded the case for a new trial with this explanation:

> The charge of the court assumes that it was the duty of the railroad company, as a matter of law, to prevent the obstruction of the view of its track at the place indicated, and that the failure to perform that duty was negligence per se, for which the plaintiff was entitled to recover, without regard to the care with which the train was operated at the time. It was error in the court to so charge the jury. Whether the obstruction was placed upon the right of way by the company itself for its own use, or permitted by it to be placed there by another to be used in connection with

62. *Id.* § 471.004(b) (formerly art. 6370b, § 3).

63. 91 Tex. 52, 40 S.W. 956, 957 (1897).

64. *Id.*

65. *Id.*

the business of the road, is unimportant. There is no law which declares it to be the duty of a railroad company to keep its right of way free from obstruction, and therefore the failure to do so cannot be declared as a matter of law to be negligence.... [T]hose obstructions, with the other surrounding circumstances, were proper to be considered upon the question of the degree of care and vigilance which the defendant was bound to exercise in the running and management of its train, and in giving warning of its approach. It cannot be an independent ground of recovery.... The fact that the view of the track was obstructed would not give a right of action if the railroad company exercised such care in the operation of its train as a prudent person, under similar circumstances, having due regard for the safety of those traveling upon the highway over that road, would have exercised. It might be that the ringing of a bell, or the blowing of a whistle, or both, would not be such care as would be required at that place. A prudent man might have felt it his duty to station some person there to give warning of the approach of a train to those who were about to cross the track. But the question to be submitted to the jury was whether or not, under the surrounding conditions and circumstances at that place, the defendant exercised such care as a prudent person would have exercised under like conditions.[66]

In 1898, in *International & Great Northern Railway Co. v. Knight*, a wagon driver was killed in a railroad crossing collision.[67] The plaintiff alleged that the railroad was at fault both in failing to signal the train's approach and in allowing various structures to be placed along the tracks, obstructing the view.[68] The trial court instructed the jury that they could find the railroad negligent on either ground and rendered judgment on a verdict for the plaintiff.[69] As in *Rogers*, we reversed and remanded the case for a new trial, holding that the jury had been improperly instructed.[70] Again we explained:

In [*Rogers*], we held that it is not negligence for a railroad to put on its right of way obstructions to the view of one approaching a crossing, whether the obstructions be placed there by the railroad for its own use, or by another, by the railroad's permission, to be used in connection with the business of the road; but it is merely a matter to be considered on the question whether there was negligence in the operation of a train at the crossing. It is obvious in the present case that the obstructions which were placed near the track of the defendant company were the ordinary structures used by the company in receiving and discharging its freight. When near a crossing, such structures necessarily obstruct the view of those using the highway, in passing over the track. From the very nature of the case, at every depot of a railway company the view of approaching trains must in some measure be shut off by the buildings which are requisite to the transaction of its business; and hence the erection and maintenance of such buildings cannot, on account of their obstructing the view of the track, be deemed negligence either

66. *Id.* at 957–958 (internal quotation marks omitted).

67. 91 Tex. 660, 45 S.W. 556 (1898).

68. *Id.*

69. *Id.* at 557.

70. *Id.* at 558.

in law or in fact.[71]

The Limmers argue that five cases decided before *Rogers* and *Knight* support a duty to clear railroad crossings of sight-restricting obstructions. One of the cases holds that a railroad has a duty to its own employees to clear its tracks and right-of-way of obstructions that could derail the train and injure them.[72] Another extends the same duty to passengers.[73] Neither discusses a railroad's duty to highway traffic to remove obstructions that restrict sight. The other three cases[74] were cited in *Rogers* as authority for our holding in that case.[75] Granted, those cases could have been read to create some uncertainty on the subject,[76] but *Rogers* removed that uncertainty.

The Limmers contend that, even if nineteenth century case law was to the contrary, public policy now favors imposing on railroads an independent duty to prevent sight obstructions at crossings. They point to state[77] and federal[78] regu-

71. *Id.* at 557.

72. *Texas & St. Louis Ry. Co. v. Vallie*, 60 Tex. 481 (1883) (holding that a railroad was negligent in allowing a tree to fall across its tracks, derailing a train, and injuring its employee).

73. *Eames v. Tex. & New Orleans Ry. Co.*, 63 Tex. 660 (1885) (holding that a railroad was negligent in failing to clear vegetation from its right-of-way, from which a cow emerged in front of a train, derailing it and injuring a passenger).

74. *Galveston, Houston & San Antonio Ry. Co. v. Michalke*, 90 Tex. 276, 38 S.W. 31 (1896); *Receivers Houston & Tex. City Ry. Co. v. Stewart*, 17 S.W. 33 (Tex.1891); *Dillingham v. Parker*, 80 Tex. 572, 16 S.W. 335 (1891).

75. *Rogers*, 40 S.W. at 958.

76. In *Dillingham*, we held that the trial court misstated the law in instructing the jury that "[i]t is the duty of those operating railway locomotives and cars to use reasonable care not to permit the view of the track to become obstructed with cars standing on the side tracks, so that persons passing along a public road or street cannot conveniently see and hear a passing engine or train, as they approach the crossing of the track". 16 S.W. at 335–336. But we added that "[i]t was for the jury to say, under proper instructions, whether *the particular acts* were negligent or not." *Id.* at 336. In *Stewart*, we said: "The [railroad], under the law, ha[s] the right to use [its] road in the exercise of its legitimate business, but the enjoyment of this privilege does not authorize [it] to exercise this right in a negligent manner. It cannot be said, as a matter of law, that the legitimate use of the side tracks of a railroad, in storing its cars or switching its trains, is or is not negligence. Whether or not it be negligence would depend upon the manner of use and the circumstances attending it." 17 S.W. at 33. And in *Michalke*, we said: "[W]e do not question the right of a railway company, as a general rule, to erect the structures necessary for the prosecution of its business, and to leave standing cars upon its side tracks, near a street or road crossing. But we think that the circumstances of a case may be such that, as a matter of fact, it may be negligence to do so." 38 S.W. at 31.

77. 43 Tex Admin. Code § 7.37(b)-(d) (2009) ("(b) Standing equipment. No railroad shall cause or allow trains, railway cars, or equipment to stand less than 250 feet from the centerline of any unprotected public grade crossing unless a closer distance cannot be avoided. (c) Vegetation. At unprotected public grade crossings, each railroad shall control vegetation on its right-of-way (except for the roadbed and areas immediately adjacent to the roadbed) for a distance of 250 feet each way from the centerline of the crossings, so that vegetation does not block the vehicular highway traffic's view of approaching trains. The 250 feet shall be measured from the point where the centerline of the railroad crosses the centerline of the public road. Where the right-of-way is fenced, this subsection shall be deemed complied with if vegetation is controlled up to two feet from the fence. (d) Permanent structures. At unprotected public grade crossings, each railroad shall keep its right-of-way clear of unnecessary permanent obstructions, such as billboards and signs that are not authorized by the railroad and that are not required for the safe operation of the

lations requiring railroads to keep right-of-ways clear. But thorough regulations do not invite an additional cause of action for negligence; they suggest one is unnecessary. The Association of American Railroads, as amicus curiae, cites data indicating that the regulation of railroad crossings has, from 1980 to 2004, coincided with a 71% decrease in collisions and a 56% decrease in collision fatalities.[79] Public policy does not require us to disturb a positive regulatory scheme.

 We reaffirm that a railroad's duty is not to clear its right-of-way of things that may obstruct sight at a crossing; a railroad's duty is to give adequate warning of approaching trains, given whatever obstructions or other conditions exist. The Limmers do not contend that the obstructions at the Front Street crossing made even active warnings, like automatic gates or a flagman, inadequate. On the contrary, they contend that the presence of the obstructions made the warning afforded by the crossbucks inadequate. Thus, the Limmers' sight-restriction claim is simply a restatement of its claim that the warning at the crossing was inadequate. As such, it is preempted.

\* \* \*

Accordingly, the judgment of the court of appeals is reversed and judgment is rendered that the Limmers take nothing.

Justice O'NEILL and Justice GUZMAN did not participate in the decision.

---

railroad, for a distance of 250 feet each way from the crossing so that the obstructions do not block the vehicular highway traffic's view of approaching trains. Billboards and signs that are legally permitted by the state or a political subdivision are not unnecessary permanent obstructions, so long as they do not block the vehicular highway traffic's view of approaching trains. Permanent buildings, such as warehouses and equipment facilities, which existed prior to June 26, 1986, are exempt from the requirements of this subsection. The 250 feet shall be measured from the point where the centerline of the railroad crosses the centerline of the public road.").

78. 49 C.F.R. § 213.37 ("Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so

that it does not—(a) Become a fire hazard to track-carrying structures; (b) Obstruct visibility of railroad signs and signals: (1) Along the right-of-way, and (2) At highway-rail crossings; (This paragraph (b)(2) is applicable September 21, 1999.) (c) Interfere with railroad employees performing normal trackside duties; (d) Prevent proper functioning of signal and communication lines; or (e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.").

79. Brief of Ass'n of American Railroads as Amicus Curiae at 4–5, *Missouri Pac. R.R. v. Limmer*, No. 06–0023 (Tex. May 3, 2006) (citing Federal Railroad Administration, Highway/Rail Crossing Accident/Incident Bulletin, 1980–1996).